

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-1997

# E.B. v. Verniero (Part I)

Precedential or Non-Precedential:

Docket 96-5132,96-5416

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"E.B. v. Verniero (Part I)" (1997). *1997 Decisions.* Paper 199.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/199

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

mJ

e the impact of the first 14 months of the state's
1993 community notification statute. Even before this

_____

8. In the single assault incident, a registrant was "punched in the nose
when he answered his door." Sheila Donnelly & Roxanne Lieb,
Washington's Community Notification Law: A Survey of Law Enforcement
7 (Dec. 1993).

23

statute, probation and parole officers with a sex offender under supervision had provided notification to "local police; immediate and extended family members in contact with the offender; victims; other residents in the offender's home; regular visitors to the home; employers; therapists; Children's Services Division; landlords and apartment managers; ministers, pastors, and other officials where the offender attends church; select neighbors; specific business[es] frequented by the offender; and close associates to the offender." Oregon Dep't of Corrections, Sex Offender Community Notification in Oregon at 7 (Jan. 1995). This practice continued after enactment of the statute requiring notification to "a broader public." As of the time of the study, there had been 237 notification plans submitted under the new law. In this context, the Oregon Department of Corrections reported as follows:

In January 1995, forty-five parole/probation sex offender specialists from thirty-five counties responded to a survey of their experience with Community Notification. These officers were responsible for a total caseload of 2,160 sex offenders. The following information was gained from the surveys and [Sex Offender Supervision] Network discussions:

*   *   *

Less than 10% of offenders experienced some form of harassment. Incidents reported included name calling, graffiti, toilet papering and minor property vandalism, monitoring of a home by video camera, repeated reports of unfounded violations to parole/ probation officers, and picketing of residences.

There were two extreme cases of retaliation. One sex offender had a gun pointed at him and was threatened. In another case, a victim had tires slashed and the offender was blamed. Although the offender passed a polygraph and was accountable for the time, there were threats made that the offender's home would be burned down.

*   *   *

Other circumstances reported by parole/probation officers included:

24

Community notification has made it more difficult to find residences for some sex offenders released from prison.

\* \* \*

Notification has [affected] employment opportunities for sex offenders.

\* \* \*

Businesses who were initially willing quietly to employ a sex offender sometimes do not provide jobs when the hiring will clearly become public.

Id. at 12-14.

IV. THE ROOKER-FELDMAN ISSUE

There is a threshold jurisdictional issue for decision. The appellants contend that the district court was without subject matter jurisdiction under the doctrine articulated by the Supreme Court in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). Section 1257 of Title 28 of the United States Code bestows upon the Supreme Court of the United States appellate jurisdiction to review final judgments of the highest courts of the respective states. The so-called Rooker-Feldman doctrine teaches that, by negative implication, the inferior federal courts lack subject matter jurisdiction to review judgments of those courts. We have interpreted the doctrine to encompass final decisions of lower state courts as well. See Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J., 973 F.2d 169, 177-78 (3d Cir. 1992).

Appellants point out that E.B. demanded and received judicial review of the prosecutor's Tier 3 classification and notification plan and that he advanced federal constitutional arguments in that proceeding for preventing the classification and notification plan from being put into effect. See Tr. Megan's Law Hearing (N.J. Super. Ct. Law Div. Dec. 7, 1995) at 6-9. The Superior Court, Law Division, after a hearing, rejected E.B.'s challenge and ordered that notification be given. E.B. appealed to the Appellate

25

Division, which affirmed. The Supreme Court of New Jersey thereafter denied E.B.'s petition for certification of appeal. As appellants stress, the relief E.B. seeks in this proceeding is an injunction directing that the notification ordered by the New Jersey Superior Court, Law Division, not be carried out.

We agree with appellants that this is a paradigm situation in which Rooker-Feldman precludes a federal district court from proceeding. To grant E.B. relief would require an inferior federal court to determine that the New Jersey court's judgment was erroneous and would foreclose implementation of that judgment. See FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996).

The district court reached a contrary conclusion because it believed that although E.B. raised constitutional issues, he "was denied an opportunity to meaningfully raise constitutional challenges to Megan's Law." 914 F. Supp. at 89 (emphasis supplied). Its belief was based primarily on the fact that the Supreme Court of New Jersey in Doe had described a Megan's Law proceeding in the trial court as a "summary proceeding" and had stated that "the only issue for the court on the Tier level of notification is the risk of reoffense." Id. at 89-90; Doe, 662 A.2d at 382-83. This suggested to the district court that the New Jersey courts do not consider constitutional challenges in a Megan's Law proceeding. 914 F. Supp. at 90.

If we shared the belief of the district court that E.B.'s constitutional challenges were not considered by the New Jersey courts--and, under Doe, could not be considered by them--we would also conclude that Rooker-Feldman did not deprive the district court of jurisdiction. However, we do not read the Doe opinion as instructing New Jersey courts to ignore properly raised claims based on the federal Constitution,9 and it is clear that the New Jersey courts do

_____

9. Consideration of constitutional issues is not inconsistent with the expectation of the Doe Court that Megan's Law proceedings in the trial court will be summary in nature. Once the constitutional issues raised by that law are authoritatively resolved, they will no longer be a component of the routine process.

26

not so read that opinion. In In re G.B., 669 A.2d 303, 306 (N.J. Super. Ct. App. Div. 1996), aff'd, 685 A.2d at 1252, the Appellate Division considered constitutional challenges and rejected them on the merits because these same issues had been previously considered and rejected in Doe. Shortly thereafter, the Superior and Supreme Courts of New Jersey, in appeals from a denial of relief in a Megan's Law proceeding, addressed constitutional challenges to Megan's Law for which there was no binding precedent. See In re C.A., 679 A.2d at 1153. Even if there were not this clear evidence, however, we would have to "assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 15 (1987).

The only remaining issue with respect to E.B. and the Rooker-Feldman doctrine is whether a litigant can be said to have a meaningful opportunity to raise an issue in a state proceeding when the highest court of that state has rejected, in another litigant's case, the same argument the litigant wishes to raise. Our answer is in the affirmative.

Rooker-Feldman abstention is necessary to preserve the United States Supreme Court's appellate jurisdiction--as well as to limit federal court review of state court decisions to the avenue provided for such by Congress. See Ernst v. Child and Youth Services of Chester County, 108 F.3d 486, 491 (3d Cir. 1997). The federal court structure established by Congress intends that only the Supreme Court have the opportunity to decide that a state court has reached an erroneous conclusion on a federal constitutional claim. Nothing suggests that this structure should be altered where the state court's decision is based upon what is already settled precedent in that state.

As we have previously observed, the interests served by Rooker-Feldman are quite similar to those served by giving a state court judgment res judicata effect in a subsequent federal proceeding. Marks v. Stinson, 19 F.3d 873, 885-86 n.11 (3d Cir. 1994); Valenti v. Mitchell, 962 F.2d 288, 297 (3d Cir. 1992). If a litigant resorts to a state court and suffers an adverse judgment, a lower federal court must respect that judgment unless and until it is overturned. The litigant's only remedy is by way of appeal through the state

27

court system and by way of petition to the Supreme Court of the United States thereafter.10

We will, accordingly, reverse the judgment of the district court in E.B.'s case11 and remand with instructions to dismiss for want of subject matter jurisdiction.

This does not mean, however, that the district court lacked jurisdiction over the class claims in W.P . As we concluded in Valenti, 962 F.2d at 298, " Rooker-Feldman does not bar individual constitutional claims by persons not parties to earlier state court litigation." In W.P., at least some of the representative plaintiffs were not the subject of any kind of judicial order when they filed this suit to secure injunctive relief against enforcement of Megan's Law. Indeed, neither they nor the state had petitioned any state court for any relief. The claims of these class plaintiffs were sufficient to confer subject matter jurisdiction 12 on the district court.13

---

10. Where, as here, the state Supreme Court exercises its discretion against review, certiorari will lie from the intermediate appellate court to the Supreme Court of the United States. See Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 678 n.1 (1968); Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 160 (1954).

11. We note that E.B. does not seek to enjoin future proceedings against him under Megan's Law. Cf. Centifanti v. Nix, 865 F.2d 1422, 1430 (3d Cir. 1989). Rather he seeks relief from a judicial judgment in a Megan's Law proceeding that has already terminated. See Valenti, 962 F.2d at 297.

12. As with standing, which also "goes to the subject matter jurisdiction of the . . . court," Page v. Schweiker, 786 F.2d 150, 153 (3d Cir. 1986), jurisdiction over the claims of a single representative plaintiff allows a court to reach the class claims. See Sosna v. Iowa, 419 U.S. 393, 402-03 (1975); see generally Wright & Miller, 7A Federal Practice and Procedure § 1755 (noting that rule authorizing class actions cannot be construed to broaden or limit subject matter jurisdiction of district courts).

13. In the district court, the Attorney General asked that W.P. be dismissed on grounds of Younger abstention. The district court rejected that contention before entering its preliminary injunction. Although Younger abstention was raised again in the Attorney General's interlocutory appeal from the preliminary injunction, that appeal was withdrawn when the district court entered summary judgment for the defendants. In the appeal now before us, the Attorney General does not

28

V. THE EX POST FACTO AND DOUBLE
JEOPARDY ISSUES

The Ex Post Facto Clause forecloses retroactive
application of a law that "inflicts a greater punishment,
than the law annexed to the crime, when committed."
Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798). The Double
Jeopardy Clause forbids "multiple punishments for the
same offense." United States v. Halper, 490 U.S. 435, 440
(1989). Accordingly, neither clause is implicated unless the
state has inflicted "punishment." Since no one here
suggests that "punishment" has a different meaning under
one of these clauses than under the other, the critical issue
to which we now turn is whether the notification called for
in situations involving Tier 2 and Tier 3 registrants is
"punishment" for purposes of the Ex Post Facto and Double
Jeopardy Clauses.

A. The Artway Standard

In Artway, when we addressed the issue of whether
registration under Megan's Law constituted "punishment,"

_____

ask us to abstain from adjudicating the plaintiffs' constitutional claims;
he asks rather that we affirm the district court's adjudication of those
claims in his favor. We have no occasion to review the district court's
disposition of the Younger abstention issues because the "State
voluntarily chooses to submit to a federal forum." Ohio Bureau of
Employment Services v. Hodory, 431 U.S. 471, 480 (1977).

The Sussex County prosecutor, also a defendant in W.P., urges in his
brief that the district court erred in failing to abstain but does not ask
us to remand with instructions to dismiss. Rather, he asks us to affirm
the judgment in his favor if we agree with the district court and to
abstain and "remit the named plaintiffs to the state courts" if we do not.
Appellee–Dennis O'Leary's Br. at 41. Thus, the Sussex County prosecutor
also "voluntarily chooses" to submit to this court's jurisdiction. Hodory,
431 U.S. at 480. Moreover, to the extent that he purports to adopt a
contrary position to that asserted by New Jersey's Attorney General, we
do not believe that he is entitled to do so. Brown v. Hotel & Restaurant
Employees & Bartenders Int'l Union, 468 U.S. 491, 500 n.9 (1984)
(notwithstanding the objection of the New Jersey Casino Commission,
because "the State's Attorney General has . . . agreed to our adjudication
of the controversy, considerations of comity are not implicated, and we
need not address the merits of the Younger abstention claim.").

29

we found no Supreme Court precedent addressing a similar statutory provision. In order to "divine" a"test for punishment," we reviewed the Supreme Court case law and looked for common considerations. 81 F.3d at 1254-63. Recognizing "that the appropriate `punishment' analysis depends on the context," we derived an "analytical framework for this case." Id. at 1261, 1263. Specifically, we concluded that a "measure must pass a three-prong analysis--(1) actual purpose, (2) objective purpose, and (3) effect--to constitute non-punishment." Id. at 1263.

Under this Artway analysis, we first look to whether the adverse effect on individuals results from a desire on the part of the legislature to punish past conduct or is a by-product of a bona fide legislative effort to remedy a perceived societal problem. "If the legislature intended Megan's Law to be `punishment,' i.e. retribution was one of its actual purposes, then it must fail constitutional scrutiny. If, on the other hand, `the restriction of the individual comes about as a relevant incident to a regulation,' the measure will pass this first prong." Id. (quoting De Veau v. Braisted, 363 U.S. 144, 160 (1960).

The second inquiry--into "objective purpose"--focuses on the operation of the legislative measure and on whether analogous measures have traditionally been regarded in our society as punishment. In Artway, we suggested that there were three aspects of "objective purpose" that should be considered by a court before deciding whether the party challenging the statute has carried its burden of showing that an objective observer in our society would perceive the measure as punitive. Id. It is important to consider the measure's proportionality--whether the remedial purpose of a legislative measure purporting to be non-punitive can explain all the adverse effects on those involved. While it is true that "even remedial sanctions carry the sting of punishment," id. at 1260 (internal quotation marks omitted), only if the sting is not "reasonably related" to the remedial goal would an objective observer be justified in perceiving a punitive purpose, id. at 1265. It is also important to consider history. If analogous measures have traditionally been regarded by our society as "serv[ing] punitive purposes" and the text and the legislative history

30

do "not make [the legislature's] plausible remedial purposes clear," id. at 1257, there is an objective basis for regarding the measure as punishment. Finally, we noted in Artway that some measures are intended to have a mixed salutary and deterrent effect. The examples we gave were taxes on illegal activities (like possession of drugs) and on activities that the state concededly wished to discourage. See id. at 1259. Such mixed measures will not be deemed to have an objectively punitive purpose despite their deterrent purpose unless that deterrent purpose is an unnecessary complement to the measure's salutary operation, the measure is operating in an unusual manner inconsistent with its historically mixed purposes, or the deterrent purpose overwhelms the salutary purpose. See id. at 1263.

"The final prong [of the Artway analysis] examines whether the effects--or `sting'--of a measure is so harsh `as a matter of degree' that it constitutes `punishment.' " Id. at 1266 (citing California Dep't of Corrections v. Morales, 514 U.S. 499, 509 (1995)). This prong necessarily involves difficult line-drawing. Unfortunately, the Supreme Court case law provides only a few fixed points. We know that, under certain circumstances, the "sting" of incarceration or forfeiture of one's citizenship is sufficiently extraordinary to require a finding of punishment, see Miller v. Florida, 482 U.S. 423 (1987); Trop v. Dulles, 356 U.S. 86 (1958), and we have recently been told that civil commitment of violent sex offenders does not, see Kansas v. Hendricks, ___ U.S. ___, 117 S. Ct. 2072 (1997).

B. The Impact Of Ursery And Hendricks

There are two recent Supreme Court cases which potentially bear upon our decision: United States v. Ursery, 116 S. Ct. 2135 (1996), and Kansas v. Hendricks, ___ U.S. ___, 117 S. Ct. at 2072. Appellees insist that after Ursery and Hendricks, Artway does not provide an appropriate standard for determining whether Megan's Law notification constitutes "punishment" for purposes of the Ex Post Facto and Double Jeopardy Clauses. We disagree.

In Ursery, the Supreme Court held that "civil forfeitures . . . do not constitute `punishment' for purposes of the

31

Double Jeopardy Clause" even when the value of the property forfeited is arguably excessive when compared to the harm suffered by the government from the conduct giving rise to the forfeiture. 116 S. Ct. at 2138. The Court first emphasized that its case law had sharply distinguished between in rem forfeiture proceedings and in personam civil fine proceedings. It explained that in the latter "it is the wrongdoer in person who is proceeded against . . . and punished" while in the former "it is the property which is proceeded against, and by resort to a legal fiction, held guilty and condemned." Id. at 2145 (quoting from Various Items of Personal Property v. United States, 282 U.S. 577, 580-81 (1931)). Thus, civil forfeitures are not "criminal punishments because they [do] not impose a second in personam penalty for the criminal defendant's wrongdoing." Id. at 2141. Second, the Court noted, "[c]ivil forfeitures, in contrast to civil penalties, are designed to do more than simply compensate the Government. Forfeitures . . . are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct. [For this reason,] it is virtually impossible to quantify, even approximately, the nonpunitive purposes served by a particular civil forfeiture." Id. at 2145. Accordingly, while a court can determine whether a civil fine has a punitive component by comparing its size to the harm experienced by the government, a court is not in a position "to determine whether a particular forfeiture bears no rational relationship to the nonpunitive purposes of that forfeiture." Id.

The holding of Ursery is a narrow one limited to civil forfeitures. Neither of the principal rationales supporting its conclusion is pertinent here and we find nothing in the Court's reasoning that is inconsistent with the Artway standard.14 It necessarily follows that Ursery provides no

_____

14. To the contrary, we believe the Court's opinion in Ursery confirms, directly or indirectly, that, inter alia, (1) measures motivated by retributive animus are punishment, (2) even when the legislative action is not so motivated, an adverse consequence resulting from an in personam proceeding may be punishment if it is disproportionate to the

32

justification for abandoning that standard. <u>See</u> Third
Circuit Internal Operating Procedures 9.1.

After the district court's decision in these cases, the
Supreme Court decided <u>Kansas v. Hendricks</u>, 117 S. Ct. at
2072. The Court there upheld a Kansas statute that
provides for the civil commitment of "sexually violent
predators." <u>See</u> Kan. Stat. Ann. § 59-29a01 et seq. Under
the statute, a person convicted or charged with a violent
sexual offense and suffering from a "mental abnormality or
personality disorder which makes the person likely to
engage in the predatory acts of sexual violence," § 59-
29a02(a), may be confined to state custody for "control,
care and treatment until such time as the person's mental
abnormality or personality disorder has so changed that the
person is safe to be at large," § 59-29a07(a). Prior to Leroy
Hendricks' scheduled release from prison, the state invoked
the statute to have him confined as a sexual predator.
Hendricks, who had an extensive history of molesting
children, challenged the act on substantive due process, ex
post facto, and double jeopardy grounds. The Supreme
Court rejected all three claims and held that the state's
involuntary commitment program did not constitute
punishment for the purpose of ex post facto or double
jeopardy.

Like <u>Ursery</u>, <u>Hendricks</u> does not establish "a single
`formula' " for identifying which legislative measures
constitute punishment and which do not. <u>Morales</u> , 514 U.S.
at 509. However, the context involved in <u>Hendricks</u>--civil
commitment of sex offenders--is, obviously, more closely
related to the context involved here than was the context of
<u>Ursery</u>. In determining the continuing viability of <u>Artway</u>,

_____

remedial goal which the measure purports to pursue, and (3) measures
that have traditionally been regarded as nonpunitive are not punishment
in the absence of a retributive motive. If we considered ourselves free to
disregard the <u>Artway</u> standard, we would be required, once again, to
"divine" a "test for punishment" by looking for common considerations in
essentially the same set of Supreme Court precedents. <u>Artway</u>, 81 F.3d
at 1254. With the one exception noted hereafter in the text, we see no
reason to believe our result would be materially different if we repeated
that process.

33

therefore, we must give careful consideration to how Hendricks addressed the question of whether civil commitment is punishment. We find substantial overlap between the factors relied on in Hendricks and those that comprise the Artway test and we discern no need to abandon (or overhaul) Artway.

The Court's analysis in Hendricks begins by inquiring into "the legislature's stated intent," 117 S. Ct. at 2082, just as Artway directs that we begin with the legislature's actual purpose. The Court found Kansas' placement of the challenged provision in the probate code instead of the criminal code, and the legislature's description of its creation as a "civil commitment procedure," to be evidence of the legislature's "disavow[ing] any punitive intent." Id. at 2082, 2085. "Nothing on the face of the statute suggest[ed] that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm." Id. at 2082.

Hendricks then goes beyond the legislature's stated intent to consider additional factors, including those factors Artway incorporates into its objective purpose prong. Like Artway's inquiry into proportionality, Hendricks repeatedly describes how the Kansas statute is tailored to achieve its remedial purpose of protecting the public. The Court observes that prior criminal conduct is appropriately examined for the narrow evidentiary purpose of predicting dangerousness. See id. The Court also notes that Kansas "limited confinement to a small segment of particularly dangerous individuals," id. at 2085, and that those affected individuals do not "remain confined any longer than [they] suffer[ ] from a mental abnormality rendering [them] unable to control [their] dangerousness," id. at 2083. As the Court recognizes, "[f]ar from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." Id. Finally, the Court observes that the individuals are subject only to the conditions placed on any involuntarily committed person in a state mental institution and not to the "more restrictive conditions" placed on state prisoners. Id. at 2082.

34

Hendricks, like Artway, relied heavily on history. In the Court's view, the confinement involved is "one classic example" in a long history of measures restricting the freedom of the dangerously mentally ill--legislative initiatives which have been consistently held to be nonpunitive. Id. at 2083. The Court specifically analogized the Kansas confinement to the quarantines of those afflicted with highly contagious diseases, and recognized that it has "never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Id. at 2084.

There is also support in Hendricks for Artway's inquiry into the relationship between a "mixed" measure's salutary and deterrent purposes. Hendricks discusses the multiple purposes of the Kansas statute, including incapacitation of dangerous sex offenders as well as their treatment, and concludes that the statute would not constitute punishment even if providing treatment were merely an "ancillary purpose"--and not the "primary" purpose--for passing the statute. Id. This is consistent with Artway's allowance that a measure can be non-punitive even when it does not have solely "salutary" purposes such as treatment.

Though Hendricks does not explicitly discuss what Artway calls the "effects prong," we find nothing in Hendricks inconsistent with Artway's direction to examine what the challenged measure actually does to the affected individuals. This is not to say, of course, that Hendricks lacks implications for the application of the effects prong. The Court held that potentially indefinite civil commitment of dangerous sex predators is not punishment. This provides a new and important "fixed point" that is of great utility in determining on which side of the punitive/nonpunitive line to place community notification.

Although Hendricks thus does not suggest to us that any of the considerations identified as relevant in Artway are no longer relevant to a challenge based on the Ex Post Facto and Double Jeopardy Clauses, we do discern a teaching in Hendricks that we do not discern in the Supreme Court case law preceding Artway. In the course of holding that Kansas' Sexually Violent Predator Act "does not impose

35

punishment," id. at 2086, the Hendricks Court made the following cogent observation regarding the deference that must be accorded to the legislature's judgment as to whether its action is remedial:

Although we recognize that a "civil label is not always dispositive," Allen [v. Illinois , 478 U.S. 364, 369 (1986)], we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof " that "the statutory scheme[is] so punitive either in purpose or effect as to negate[the State's] intention" to deem it "civil." United States v. Ward, 448 U.S. 242, 248–249, 100 S. Ct. 2636, 2641, 65 L.Ed.2d 742 (1980).

Id. at 2082.

As we pointed out in Artway, the Supreme Court had previously required this degree of deference only in cases where the issue before it was "whether a proceeding is effectively criminal so that the procedural protections of the Fifth and Sixth Amendments must apply" in that proceeding. Artway, 81 F.3d at 1262 n.26. After Hendricks, however, it seems clear that similar deference to the legislative judgment is required whenever legislative measures are challenged on the basis of the Ex Post Facto and Double Jeopardy Clauses.15 While the Hendricks Court did characterize Hendricks' claim at one point as an "argument . . . that the Act establishes criminal proceedings," 117 S. Ct. at 2081, the issue before the Court

_____

15. This aspect of Hendricks was foreshadowed in Ursery where, as we have noted, the Court entertained a double jeopardy challenge to federal civil forfeiture legislation. After concluding that Congress had not intended the legislation as punitive, the Court observed:

Moving to the second stage of our analysis, wefind that there is little evidence, much less the "clearest proof " that we require, suggesting that forfeiture proceedings under 21 U.S.C. §§ 881(a)(6) and (a)(7), and 18 U.S.C. § 981(a)(1)(A), are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary.

Ursery, 116 S. Ct. at 2148 (internal quotation marks and citations omitted).

was whether the Act imposed "punishment" for purposes of the Ex Post Facto and Double Jeopardy Clauses, and the Court's holding was that the Act did not.

Accordingly, in Artway terms, if we determine that the actual legislative purpose was remedial, we must sustain Megan's Law against the current challenges unless its objective purpose or its effect are sufficiently punitive to overcome a presumption favoring the legislative judgment.

## C. Legislative Purpose

As we have indicated, in Artway we addressed only whether Tier 1 registrants under Megan's Law are subjected to punishment––that is, whether being required to register, and having the resulting disclosures available to law enforcement personnel, constitute punishment. In that context, we determined "whether the legislature's actual purpose [when enacting Megan's Law] was to punish." Artway, 81 F.3d at 1264. Looking to the statute's own statement of purpose[16] and the scant legislative history,[17]

_____

16. The Legislature finds and declares:

a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.

b. A system of registration of sex offenders and offenders who commit other predatory acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.

N.J.S.A. 2C:7-1; Artway 81 F.3d at 1264.

17. The only other legislative history is the following statement that accompanied the bill when it was introduced in the state senate:

 Heinous crimes have been committed against children after [sex offenders'] release from incarceration. The most recent case involves the tragic rape and murder of seven-year-old Megan Kanka of Hamilton Township by a neighbor who had committed sex offenses

we found that the legislative purpose of Megan's Law was to identify potential recidivists and alert the public when necessary for the public safety, and to help prevent and promptly resolve incidents involving sexual abuse and missing persons. We then noted that "[p]rotecting the public and preventing crimes are the types of purposes [the Supreme Court has] found `regulatory' and not punitive." Id.; see also De Veau, 363 U.S. at 160. We therefore concluded that the restrictive provisions of Megan's Law passed the "actual purpose" test.

Since in Artway we were only dealing with a challenge to registration, we were not required to definitively resolve the legal question of the actual purpose of notification.18 However, the record evidence of legislative intent is exactly the same for both registration and notification. Nothing has been called to our attention that causes us to change the conclusion we reached in Artway regarding this evidence. While the appellants view the context in which Megan's Law was enacted as indicative of a punitive intent, wefind it entirely consistent with its declared remedial purpose. Accordingly, we have no basis for questioning the legislature's declared purpose, which is remedial and devoid

_____

against children. Residents of the neighborhood had no knowledge of the man's criminal history.

 Because sex offenders are likely to be unsusceptible to the "cures" offered by the prison system, the urges that cause them to commit offenses can never be eliminated but merely controlled. The danger posed by the presence of a sex offender who has committed violent acts against children requires a system of notification to protect the public safety and welfare of the community.

Senate Bill No. 14 (N.J. Sept. 12, 1994); Artway , 81 F.3d at 1264.

18. Appellants assert that all we determined in Artway was that the actual purpose of registration is remedial; they claim we said nothing about the legislative purpose for notification. They are mistaken. In Artway, we used what appeared to us to be the nonpunitive actual purpose of notification as the predicate for determining that the motivation for registration is remedial as well. See 81 F.3d at 1264 ("[I]f the legislature's actual purpose in notification was remedial, it is hard to imagine that its purpose in the predicate and less harsh step of registration was punitive.").

38

of any indication of an intent to punish. We must give substantial deference to that judgment.

D. Objective Purpose

In Artway, we concluded that registration and Tier 1 notification of law enforcement personnel was fully explained by the nonpunitive, legislative purpose. We explained:

 Here, the solely remedial purpose of helping law enforcement agencies keep tabs on these offenders fully explains requiring certain sex offenders to register. Registration may allow officers to prevent future crimes by intervening in dangerous situations. . . . [T]he registrant may face some unpleasantness from having to register and update his registration[, b]ut the remedial purpose of knowing the whereabouts of sex offenders fully explains the registration provision . . . . And the means chosen--registration and law enforcement notification only--is not excessive in any way. Registration, therefore, is certainly "reasonably related" to a legitimate goal: allowing law enforcement to stay vigilant against possible re-abuse.

81 F.3d at 1265.

The issue now before us is whether the provisions of Megan's Law that call for dissemination of information about registrants beyond law enforcement personnel are also fully explained by the nonpunitive, legislative purpose. In addressing this issue, there is a lesson in the above-quoted portion of Artway that we must keep in mind. The relevant issue is whether these provisions are " `reasonably related' to a legitimate goal." Nothing in Artway or the Supreme Court cases upon which it relies requires a perfect fit between end and means. Nor does anything in Ursery or Hendricks. An absence of remedial, objective purpose is not demonstrated by pointing out that the legislature did not address what might be perceived as another aspect of the same problem or that there may be a means of serving the legislative end that would be more effective than the means chosen. If a reasonable legislator motivated solely by the declared remedial goals could have believed the means

39

chosen were justified by those goals, then an objective observer would have no basis for perceiving a punitive purpose in the adoption of those means.

We conclude that the Tier 2 and 3 dissemination of information beyond law enforcement personnel is reasonably related to the nonpunitive goals of Megan's Law. As we have already indicated, these goals include identifying potential recidivists, notifying those who are likely to interact with such recidivists to the extent necessary to protect public safety, and helping prevent future incidents of sexual abuse. The fundamental premise of Megan's Law is that registration and carefully tailored notification can enable law enforcement and those likely to encounter a sex offender to be aware of a potential danger and "to stay vigilant against possible re-abuse." Id. This is not an unreasonable premise.

Moreover, these goals have not been pursued in a way that has imposed a burden on registrants that clearly exceeds the burden inherent in accomplishment of the goals. The statutory scheme is a measured response to the identified problem that does not subject all registrants to dissemination of information beyond law enforcement personnel. The Guidelines call for a risk assessment based on objective criteria, all of which might reasonably be perceived as relevant to the degree of risk presented by each registrant. This risk assessment is utilized to determine the maximum scope of the notification concerning the registrant. In the case of Tier 1 registrants, who comprise over 45% of those required to register, dissemination is limited to law enforcement personnel. In the case of the moderate risk registrants in Tier 2, who comprise 50% of those evaluated, dissemination is limited to those in the community who have responsibility for, or provide support to, those who are most likely to be victimized if the registrant recidivates. Even with respect to the 5% of registrants determined to pose higher risk, there is no unlimited public dissemination. Under the Guidelines, information is disseminated only to those who are "reasonably certain" to encounter the registrant.

Appellants nevertheless insist that the remedial goal of Megan's Law does not fully justify the means selected.

40

First, they point to the fact that risk assessment under the Guidelines is based primarily on the registrant's past behavior. Past criminal conduct is the basis for 90 of the possible 111 points in the Registrant Risk Assessment Scale. Id. at 1266 n.30. According to appellants, this Scale fails to take sufficient account of treatment or other positive changes in a registrant's life. They conclude that"the reach of this law will necessarily be excessive, encompassing those who do not actually pose a genuine risk of re-offense." Appellants' Br. at 41. However, the non-existence of a perfect predictor of recidivism should not preclude legislative resort to a rationally based instrument of risk assessment, developed and validated by mental health professionals. The most appellants have done is to suggest that a more effective predictor might be devised; that is not enough to make the objective purpose of the predictor adopted a punitive one.[19]

Appellants further suggest that the information disseminated is often excessive in light of the stated remedial aims. The information disseminated with respect to a Tier 2 or Tier 3 registrant includes his or her name, description, recent photograph, address, place of employment or schooling, and a description of any vehicle used by him or her along with its license number. Appellants point out that some of this information will sometimes be unnecessary. "[F]or example, if the registrant works 20 or 30 miles from his home, the registrant's neighbor who receives notification is not `likely to encounter' the registrant at his place of employment. Likewise, those who live near the same registrant's place of employment are not `likely to encounter' the registrant at his home. Yet in both instances, notification includes the same information . . . ." Id.

We are not persuaded. First, information that an offender does not spend all of his time in the vicinity, but does have a residence or a place of employment/school elsewhere,

---

19. As the Court expressly recognized in Hendricks, "[p]revious instances of violent behavior are an important indicator of future violent tendencies." 117 S. Ct. at 2080 (quoting Heller v. Doe, 509 U.S. 312, 323 (1993)).

may indeed serve a remedial purpose in helping individuals know when it is that they are "likely to encounter" the offender. Moreover, even if this were not so, a decision not to expend the resources necessary to tailor each notice to the circumstances of the person receiving notice is hardly inconsistent with good faith pursuit of the declared remedial purposes.

Having found a reasonable "fit" between end and means, we turn to historical precedent. To appellants, the dissemination of information beyond law enforcement personnel is closely analogous to the well-recognized historical punishments of public shaming, humiliation and banishment as those practices were employed in colonial times. We rejected a very similar argument in United States v. Criden, 648 F.2d 814 (3d Cir. 1981). There, the district court had denied the media the right to copy, for rebroadcast, video and audio tapes admitted into evidence and played to the jury during a criminal trial. In support of its decision to foreclose post-trial dissemination of public record information to the public, the district court made the following observation:

 The greater and more widespread the publicity about a particular criminal case, the more likely it is that penalties not prescribed by the law will be visited upon the accused and, more importantly, upon innocent relatives and friends. . . .

 Given the nature of our society these side effects are inevitable; indeed, it can be argued that they form an important, if unofficial, part of the sanctions imposed by society upon lawbreakers. The unfortunate fact is, however, that these side effects are not uniformly visited upon persons accused of violating the law. And, since they are not an official part of the criminal justice process, and are beyond the reach of that process, there is probably no acceptable way of ensuring uniformity of application.

Id. at 824 (quoting United States v. Criden, 501 F. Supp. 854, 860 (E.D. Pa. 1980)). In pursuing this theme, the district court likened the proposed rebroadcast to placing the defendant in public stocks.

42

We rejected the tendered analogy:

 Nor can we accept the [district] court's strained
analogy of rebroadcast to "parading a convicted
defendant through the streets, or holding him up to
public ridicule by exhibiting him in a cage or in the
stocks." 501 F. Supp. at 860.

Id. at 825. Nor can we accept the suggested analogy
between notification's re-publication of information publicly
available at the time of a sex offender's trial and the holding
of a convicted defendant up to public ridicule. Public
shaming, humiliation and banishment all involve more than
the dissemination of information. State dissemination of
information about a crime and its perpetrators was
unnecessary in colonial times because all in the colonial
settlement would have knowledge of these matters. Rather,
these colonial practices inflicted punishment because they
either physically held the person up before his or her fellow
citizens for shaming or physically removed him or her from
the community.

The "sting" of Megan's Law for Tier 2 and 3 registrants
results not from their being publicly displayed for ridicule
and shaming but rather from the dissemination of accurate
public record information about their past criminal
activities and a risk assessment by responsible public
agencies based on that information. This distinction makes
a substantial difference when one looks for the relevant
historical understanding of our society. Dissemination of
information about criminal activity has always held the
potential for substantial negative consequences for those
involved in that activity. Dissemination of such information
in and of itself, however, has never been regarded as
punishment when done in furtherance of a legitimate
governmental interest.

When there is probable cause to believe that someone
has committed a crime, our law has always insisted on
public indictment, public trial, and public imposition of
sentence, all of which necessarily entail public
dissemination of information about the alleged activities of
the accused. As this court has explained, we insist upon
this public dissemination for a number of reasons: It

43

"heightens public respect for the judicial process," it "permits the public to . . . serve as a check upon the judicial process," and it "plays an important role in the . . . free discussion of governmental affairs." Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) (internal quotation marks omitted). Wholly independent of the criminal sanctions that conviction may entail, the consequences of our law requiring this public dissemination of information can be severe. In every case, a conviction becomes a matter of public record, and in many cases that conviction may receive widespread media attention. Depending upon the crime and the circumstances, information disseminated as a result of our insistence on public prosecution may be the source of a wide range of adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism and/or vigilante retribution. Employment may be lost, and the opportunity for future employment may be dramatically reduced. It may take a lifetime of effort on the part of a convicted defendant to restore previously existing relationships with those with whom he deals personally, and restoration of his reputation among others may never occur. Nevertheless, our laws' insistence that information regarding criminal proceedings be publicly disseminated is not intended as punishment and has never been regarded as such.

We believe the required dissemination of information generated by our criminal justice system and the subsequent dissemination of "rap sheet" information to regulatory agencies, bar associations, prospective employers and interested members of the public[20] constitute far more

---

20. New Jersey law specifically guarantees public access to all court records, including those concerning criminal prosecutions. See Doe, 662 A.2d at 407 (citing Executive Order No. 123). Moreover, as the New Jersey Supreme Court noted in Doe, any person, under New Jersey law, "may obtain a complete criminal history from the State Police by providing a name and either date of birth or social security number and paying a fifteen dollar fee." Id.

44

compelling analogies than the stocks, cages, and scarlet
letters referenced by appellants.21

We also agree with appellees that various forms of state
warnings about threats to public safety provide more apt
analogies to Tier 2 and Tier 3 notification than the
referenced colonial practices. In order to provide members
of the public with an opportunity to take steps to protect
themselves, the government has traditionally published
appropriate warnings about a range of public hazards.
Posters warning that a pictured individual is abroad in the
community and to be regarded as armed and dangerous
come most readily to mind. But there are others as well.
The state has traditionally, for example, posted quarantine
notices when public health is endangered by individuals
with infectious diseases. Cf. Hendricks, 117 S. Ct. at 2084
("A State could hardly be seen as furthering a `punitive'
purpose by [isolating] persons inflicted with a[ ] highly

---

21. "Rap Sheets" are less readily available today than in days past, but
this reflects a policy judgment about the appropriate balance between
the defendant's interest in getting a new start and the interest of others
who might find "Rap Sheet" information relevant to their decision
making. See Department of Justice v. Reporters Comm. for Freedom of the
Press, 489 U.S. 749, 764-65 (1989) (observing federal and state statutory
and regulatory limitations on access to "Rap Sheets"). It does not reflect
a general understanding that the dissemination of "Rap Sheet"
information by the government is additional punishment.

While the Supreme Court recognized in Reporters Committee that "Rap
Sheets" are protected under the privacy-for-law-enforcement-records
exemption to the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C),
such protection reflects a Congressional policy judgment, not federal
Constitutional law. See id. at 762 n.13. The Court explained:

 The question of the statutory meaning of privacy under the FOIA
is, of course, not the same as the question whether a tort action
might lie for invasion of privacy or the question whether an
individual's interest in privacy is protected by the Constitution. See,
e.g., Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975)
(Constitution prohibits State from penalizing publication of name of
deceased rape victim obtained from public records); Paul v. Davis,
424 U.S. 693, 712-714 (1976) (no constitutional privacy right
affected by publication of name of arrested but untried shoplifter).

Id.

45

contagious disease.").22 Significantly, these warnings communicate not only facts about past events but also the fact that a public agency has found a significant future risk based on those events.

Whenever these state notices are directed to a risk posed by individuals in the community, those individuals can expect to experience embarrassment and isolation. Nevertheless, it is generally recognized that the state has a right to issue such warnings and the negative effects are not regarded as punishment. Because the closest analogies have not historically been regarded as punishment, we conclude that historical precedent does not demonstrate an objective punitive purpose.

Finally, we turn to the third consideration involved in assessing objective purpose. That consideration, as we understand it, is a savings provision--that is, even if the remedial purpose of a measure cannot fairly be said to justify all of its aspects, it will nevertheless be found nonpunitive if measures of this type, like taxes, have traditionally served both remedial and deterrent purposes and the particular measure before the court serves such purposes in a manner consistent with its analogous antecedents. Having concluded that the remedial purpose of Megan's Law justifies all of its aspects, it necessarily follows in this case, as it did in Artway, 81 F.3d at 1266, that this third consideration does not counsel in favor of a finding that it is punitive.

E. Effects

As we have indicated, we hypothesized in Artway that "a law [could] constitute unconstitutional `punishment' because of its effects" even where no actual or objective punitive purpose is shown. 81 F.3d at 1260. We explained:

[An] examination of effects, like the Austin [v. United States, 509 U.S. 602 (1993),] inquiry into history, is

_____

22. Other examples are provided by the New Jersey statutes requiring public notice when an adult inmate is considered for parole and notice to victims upon a defendant's release from incarceration. See N.J.S.A. 30:4-123.48g & 123.45b(5); N.J.S.A. 52:4B-44b(21).

necessary to limit what would otherwise be the untenable results of the De Veau subjective purpose inquiry and the Halper means-end calculus. While even a substantial "sting" will not render a measure "punishment," . . . at some level the "sting" will be so sharp that it can only be considered punishment regardless of the legislators' subjective thoughts.

Id. at 1261.

It is clear from Artway, however, that for the effects of a measure to render it "punishment," those effects must be extremely onerous. Even deprivation of one's livelihood is not sufficiently onerous. Flemming v. Nestor , 363 U.S. 603 (1960) (termination of social security benefits); Hawker v. New York, 170 U.S. 189 (1898) (revocation of license to practice one's profession). Moreover, while Artway's third prong serves as an independent hurdle that a legislative measure must surmount, when it is applied, the burden imposed must still be evaluated in the light of the importance of any legitimate governmental interest served. The only examples the case law suggests of effects sufficiently onerous are deprivation of one's United States citizenship that leaves one a "stateless person" and a complete deprivation of personal freedom (i.e., incarceration). Even these deprivations are not per se punishment, however. While in some circumstances making one a "stateless person" is punishment, denaturalization as a remedy for citizenship fraudulently obtained is regarded not as punishment but as a necessary part of regulating naturalization of aliens. See Trop, 356 U.S. at 98. Even incarceration is not always punishment. Pre-trial detention and post-sentence civil commitment of dangerous offenders have both been expressly found to be nonpunitive measures when justified by important state interests. See United States v. Salerno, 481 U.S. 739 (1987); Hendricks, 117 S. Ct. at 2072.

The direct effects of Megan's Law clearly do not rise to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment. All Megan's Law mandates is registration and notification. Under Megan's Law, New Jersey has not deprived appellants of their freedom or their citizenship. The state

47

has imposed no restrictions on a registrant's ability to live and work in a community, to move from place to place, to obtain a professional license or to secure governmental benefits.

What concerns registrants, however, are the indirect effects: Actions that members of the community may take as a result of learning of the registrant's past, his potential danger, and his presence in the community. People interact with others based on the information they have about them. Knowing that someone is a convicted sex offender and has been evaluated as a continuing risk is likely to affect how most people treat that person.

There can be no doubt that the indirect effects of Tier 2 and Tier 3 notification on the registrants involved and their families are harsh. The record documents that registrants and their families have experienced profound humiliation and isolation as a result of the reaction of those notified. Employment and employment opportunities have been jeopardized or lost. Housing and housing opportunities have suffered a similar fate. Family and other personal relationships have been destroyed or severely strained. Retribution has been visited by private, unlawful violence and threats and, while such incidents of "vigilante justice" are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them. It also must be noted that these indirect effects are not short-lived. While there are suggestions in the record that the circumstances of a registrant may stabilize as time passes after notification, the statute permits repeat notification over a period of many years.

The primary sting from Megan's Law notification comes by way of injury to what is denoted in constitutional parlance as reputational interests. This includes the burdens of isolation, harassment, loss of opportunities, and the myriad of more subtle ways in which one is treated differently by virtue of being known as a potentially dangerous sex offender. The other type of indirect effect is exposure to an increased risk of private violence that can result in damage to one's property or injury to one's person. We will focus on each class of indirect effects in turn.

Injury to reputation has traditionally been regarded in our society as a serious matter. Our law of defamation has from our earliest days protected reputation and provided compensation for wrongful injury to reputational interests. It has provided recourse, for example, for those whose reputations are injured by false allegations of criminal activity. At the same time, however, reputational interests have not been accorded the same level of protection in our society as interests that have been found "implicit in the concept of ordered liberty." Paul v. Davis , 424 U.S. 693, 713 (1976).

In Paul v. Davis, law enforcement officials decided to alert local area merchants to possible shoplifters who might be operating during the Christmas season. They distributed a "flyer" to 800 merchants which contained the name and "mug shot" photo of individuals described as"Active Shoplifters." Davis, who had previously been arrested for-- but never convicted of--shoplifting was included.

Davis brought a civil rights action against the law enforcement officials arguing that, by destroying his reputation in the community, they had violated his"right to privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments." Id. at 712. Though acknowledging that the Constitution secures a right to personal privacy, the Supreme Court rejected the notion that Davis' interest in his reputation was sufficiently fundamental to come within that constitutional right. The Court observed:

In Roe [v. Wade, 410 U.S. 113 (1973)], the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty" as described in Palko v. Connecticut, 302 U.S. 319, 325 (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection--matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

Id. at 713.

The indirect effects experienced by Tier 2 and Tier 3 registrants, while quite likely more profound than those complained of by Davis, are clearly of a similar nature. Just as Davis sought constitutional protection from the consequences of state disclosure of the fact of his shoplifting arrest and law enforcement's assessment that he was a continuing risk, so registrants seek protection from what may follow disclosure of facts related to their sex offense convictions and the resulting judgment of the state that they are a continuing risk. It follows that, just as the officers' publication of the official act of Davis' arrest did not violate any fundamental privacy right of Davis', neither does New Jersey's publication (through notification) of registrants' convictions and findings of dangerousness implicate any interest of fundamental constitutional magnitude. The reputational interests asserted by appellants are "very different" from matters relating to marriage, procreation, and child rearing, and are therefore "far afield" from what has been deemed "fundamental" by the Constitution.23

Hendricks, and the long line of cases on which it relies,

_____

23. Reporters Committee, 489 U.S. at 749, does not call Paul's teaching into question. We do not agree with the Supreme Court of New Jersey's conclusion in Doe that the recognition in Reporters Committee of a statutory right to privacy for "Rap Sheets" under FOIA dictates that a federal Constitutional right to privacy is implicated by notification. See Doe, 662 A.2d at 410-11. As mentioned above, Reporters Committee noted the differences between "privacy" under FOIA and an "individual's interest in privacy" under the federal Constitution. 489 U.S. at 762 n.13.

50

counsels that bona fide remedial legislation may inflict very substantial individual hardship without implicating the Ex Post Facto and Double Jeopardy Clauses. It necessarily follows that some limit must be placed on the situations in which a measure's sting alone, despite its remedial purpose and effect, will constitute punishment under those clauses and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic. "[F]reedom from physical restraint`has always been at the core of the liberty protected' " by the Constitution. Hendricks, 117 S. Ct. at 2079 (quoting Foucha v. Louisiana, 504 U.S. 71, 80 (1992)). Freedom of thought and expression and freedom from state interference with the privacy interests identified in Davis are similarly "implicit in our concept of ordered liberty." Davis, 424 U.S. at 713. Interests such as these are sufficiently fundamental to our constitutionally secured liberty that state interference with them can be justified only by the most important of state interests.[24]Davis establishes that reputational interests are not among these fundamental liberty interests.

We believe the state's interest protecting the public here is similar to, and as compelling as, the state interest served by the civil commitment statute in Hendricks. Accordingly, based on Hendricks, we believe that the state's interest here would suffice to justify the deprivation even if a fundamental right of the registrant's were implicated. Given that something less than a fundamental interest is implicated, the impact of Megan's Law on the registrants' reputational interests is necessarily insufficient alone to constitute "punishment."

---

24. As we explained in Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682, 688 n.1 (3d Cir. 1991), aff'd in part and rev'd in part, 505 U.S. 833 (1992):

Government interference with personal rights within the scope of the life, liberty, or property umbrella of the Due Process Clauses must be justified by a legitimate state interest; government interference with a "fundamental right" may be justified only by the most important of state interests.

We now turn to the second type of indirect effects arising from notification. As we earlier observed, the record bears evidence of retributive assaults on registrants by private individuals. There is also evidence of vandalism and other damage to property of registrants and their associates. As we have also noted, however, each notification is accompanied by a warning against misuse of the information conveyed and an assurance that any private violence will be prosecuted. This is thus not a situation in which the state has encouraged private violence. Nor is it a situation in which the state has in some way incapacitated a person from taking steps to protect him- or herself against private violence or has deprived a citizen of the law enforcement protection accorded to others in the population generally. On the contrary, the state has taken affirmative steps to discourage private violence in response to notification, and is providing registrants with the law enforcement protection available to others.

We agree with the district court that the risk of private violence stems primarily from a registrant's past criminal activity. The most that can be said about notification is that the state, by disseminating accurate information about a registrant's crime and its assessment of future risk, may materially extend the period during which the increased risk of private violence may exist. While the extension of that increased risk is understandably of concern to plaintiffs, they have not persuaded us that the magnitude of the risk is such as to require classification of its extension as punishment. Although the record reflects that personal injury and property damage from private violence has occurred, it also reflects that these occurrences are relatively rare. Of the 135 notifications completed in New Jersey for which there is record data, only two occasioned assaults or property damage deemed serious enough by the victim-registrant to warrant a report to law enforcement authorities. Even if we were prepared to broaden our consideration to include examples of physical harm to registrants not reported to police, this would increase the total number of record cases to just three. Our record with respect to Washington and Oregon also evidences that

52

reported instances of personal injury or property damage are rare.25

As we view this matter, there is unfortunately a background risk of private violence that is necessarily assumed by everyone in our society. When one commits a reprehensible crime and is publicly prosecuted, that risk is undoubtedly augmented to a limited degree. The duration of that degree of augmented risk is likely to be extended by notification pursuant to Megan's Law and this is understandably a concern for registrants. Nevertheless, we believe the Supreme Court would not regard this indirect effect of Megan's Law as sufficiently burdensome to require classification of the law as punitive. Certainly, in terms of the impact on the everyday lives of registrants, the burden of this aspect of Megan's Law pales by comparison to the civil commitment of sex offenders sanctioned in Hendricks.

## F. Satisfaction Of The Artway Test

Because Megan's Law satisfies each of the three elements of the Artway test, we hold that the notification required by Megan's Law does not constitute punishment for purposes of the Ex Post Facto and Double Jeopardy Clauses.

_____

25. The Supreme Court has held that "[a]mong the historic liberties . . . protected [by the Constitution is] a right to be free from . . . unjustified [state] intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673 (1977). For citizens who are not in the custody of the state, however, this right does not include the right to state protection from private violence. See DeShaney v. Winnebago County Dep't of Soc. Services, 489 U.S. 189 (1989). The "state created danger" cases based upon this right to personal security do not recognize a right that is implicated here because they do not involve situations where the risk created is justified by the state's pursuit of a legitimate public interest. See, e.g., Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir. 1989).

53

VI. THE PROCEDURAL DUE PROCESS ISSUES

A. Deprivation Of A Liberty Interest

The Fourteenth Amendment of the United States
Constitution provides that "no person shall be deprived of
life, liberty, or property without due process of law." U.S.
Const. Amend. XIV. Appellants insist that they have a
liberty interest that entitles them to the protection of
procedural due process under this provision. Appellees
insist that there is no such interest.

Liberty interests that trigger procedural due process may
be created by state law or by the federal constitution itself.
See Sandin v. Conner, ___ U.S. #6D6D 6D#, 115 S.Ct. 2293 (1995).
We need not reach the issue of whether appellants have a
liberty interest recognized by the federal constitution
because we are satisfied that appellants have a liberty
interest created by the New Jersey Constitution of which
they cannot be deprived without being accorded the process
due under the Fourteenth Amendment.

If a state law requires that the freedom of a person on
parole or probation cannot be taken away without cause,
the state has created a liberty interest that cannot be taken
away without the process due under the Fourteenth
Amendment. See Gagnon v. Scarpelli, 411 U.S. 778 (1973);
Morrissey v. Brewer, 408 U.S. 471 (1972). Similarly here,
we know from Doe that the New Jersey Constitution gives
Tier 2 and Tier 3 registrants the right to be free from Tier
2 and Tier 3 notification absent a showing of an overriding
state interest. The New Jersey Supreme Court there held
not only that Tier 2 and Tier 3 registrants had a right to the
procedural due process guaranteed by the New Jersey
Constitution, but also that they had a substantive right
under that Constitution to be free of the disclosures
required by Megan's Law, absent a demonstration that
such disclosures are required by a legitimate and
substantial state interest.26 As the court explained:

_____

26. Compare Tony L. v. Childers, 71 F.3d 1182 (6th Cir. 1995), cert.
denied, ___ U.S. ___, 116 S. Ct. 1834 (1996) (holding that state statutes
which merely establish procedures and do not mandate any particular
substantive result do not give rise to a state-created "liberty interest").

54

With its declaration of the right to life, liberty, and the pursuit of happiness, Article I, § 1 of the New Jersey Constitution encompasses the right of privacy. . . . We have found a constitutional right of privacy in many contexts, including the disclosure of confidential or personal information. Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 96, 609 A.2d 11 (1992) (citing In re Martin, 90 N.J. 295, 447 A.2d 1290 (1982)).

In resolving conflicts between the government's need for information and the individual's right of confidentiality, this Court has adopted a balancing test similar to that adopted by the federal courts. Martin, supra, 90 N.J. at 318, 447 A.2d 1290. We concluded, in Martin, that " `even if the governmental purpose is legitimate and substantial . . . the invasion of the fundamental right of privacy must be minimized by utilizing the narrowest means which can be designed to achieve the public purpose.' " Ibid. (quoting Lehrhaupt v. Flynn, 140 N.J.Super. 250, 262, 264, 356 A.2d 35 (App.Div. 1976), aff'd o.b., 75 N.J. 459, 383 A.2d 428 (1978)). . . .

662 A.2d at 412.27

_____

27. While it is clear that deprivation of a state created liberty interest triggers due process protection, and that a state created right to be free of physical restraint is such an interest, the scope of the phrase "liberty interest" as used in the context of the Due Process Clause has not been fully delineated. See, e.g., Paul, 424 U.S. at 708–09 (observing that deprivation of a state law right to obtain liquor in anonymity when combined with the stigma of defamation would implicate a state-created "liberty interest," while the stigma alone would not do so). The phrase "property interest" in this context has been broadly construed, however, to include contract rights, choses-in-action, and a right to state created benefits. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 807 (1985) (legal and equitable claims); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9–10 (1978) (utility service); Goss v. Lopez, 419 U.S. 565, 574 (1975) (school attendance); Perry v. Sindermann, 408 U.S. 593, 602 (1972) (employment contract). Indeed, "property interest" has been interpreted so as to extend procedural due process protection to virtually all rights that states will enforce in a court of law. With this background, we believe that the Supreme Court would interpret "liberty interest" in the context of the Due Process Clause to include a state created right to privacy like that recognized in Doe.

55

B. Standards For Determining The Process Due

Having concluded that Tier 2 and Tier 3 registrants are entitled to due process under the Fourteenth Amendment of the federal Constitution, we turn to the issue of what process is due them. Appellants contend that two procedural protections are due that are absent from the Megan's Law scheme. They insist that due process requires both that the burden of persuasion at a Megan's Law hearing be on the state rather than the registrant, and that the state's burden at such a hearing be to demonstrate the propriety of the tier classification and the notification plan by clear and convincing evidence.28

_____

28. As we have noted, appellants also argue that the notice of a proposed notification cannot be dispensed with in emergency situations as the Supreme Court of New Jersey has suggested. We decline to address that issue for the same reason that we declined to do so in Artway--it is unripe. 81 F.3d at 1252; see Abbott Labs. v. Gardner, 387 U.S. 136 (1967). "The right to notice is not absolute;" instead, due process provides for a right to " `reasonably calculated' notice." Artway, 81 F.3d at 1252 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)). "[T]he State cannot dispense with notice when that notice is possible and irreparable harm could result." 81 F.3d at 1252; see United States v. Raffoul, 826 F.2d 218, 224 (3d Cir. 1987).

The Megan's Law standard for dispensing with notice, as articulated in Doe and the Guidelines, involves cases where it is "impossible as a practical matter" to give notice or to do so in a timely manner. 662 A.2d at 382; Guidelines at 17. None of the representative plaintiffs asserts that his notification issued absent notice; nor is there anything in the record indicating that New Jersey's prosecutors have ever dispensed with notice or plan to do so. The only indication we have as to what circumstances would meet the standard is the suggestion in the Guidelines that a prosecutor may apply for a court order to effect notification absent notice where she does not receive notice of the release of a sex offender until after the date of release or she can demonstrate that she made "every good faith effort" to serve a registrant who merely avoided service. Guidelines at 17-18. As in Artway, we simply do not have the necessary "factual matrix" against which to evaluate this standard. 81 F.3d at 1252.

There is another consideration which, as it did in Artway, would prevent us from reaching the notice issue here--the Pullman abstention doctrine. Id. at 1252 n.12; see Railroad Comm'n v. Pullman, 312 U.S.

56

Mathews v. Eldridge, 424 U.S. 319 (1976), provides the framework we must apply to analyze both the burden of persuasion claim--whether it is the state or the registrant who must persuade the court on the material points--and the standard of proof claim--whether, if the burden of persuasion is on the state, the state must prove its case by a preponderance or by clear and convincing evidence. As Mathews teaches:

[D]ue process is flexible and calls for such procedural protections as the particular situation demands. Morrissey v. Brewer, 408 U.S. 471, 481 (1972). .. .

More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 334-35.

The Supreme Court has twice applied the Mathews test in the specific context of a challenge to the preponderance of evidence standard of proof. Santosky v. Kramer, 455 U.S. 745 (1982), posed the issue of whether due process requires the state to prove its case in a termination of parental rights proceeding by clear and convincing evidence, rather than merely by a preponderance of evidence. Addington v. Texas, 441 U.S. 418 (1979), presented the issue of the state's burden in a civil

---

496 (1941). The New Jersey courts have yet to interpret the "impossible as a practical matter" standard, and "[t]o the extent state court interpretation would make the standard comport with due process, abstention would probably be appropriate even if the issue were ripe." 81 F.3d at 1252 n.12.

57

commitment proceeding. In each instance, the Court, in addition to identifying the private and public interests at stake and evaluating the relative risk of error in the particular kinds of proceedings involved, addressed whether the standard employed "fairly allocates the risk of an erroneous factfinding between the[ ] parties." Santosky, 455 U.S. at 761. As the Santosky Court explained:

Addington teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

Id. at 755.

In both Santosky and Addington, the Court held that due process required the state to carry the burden of persuasion by more than a preponderance of the evidence, since the preponderance standard requires litigants to "share the risk of error in roughly equal fashion." Addington, 441 U.S. at 423. Neither a person threatened with a termination of parental rights nor one standing in jeopardy of a civil commitment "should . . . be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." Id. at 427.

58